IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
                                    )
THOMAS DANTE,                       )
                                    )      No. 12 C 4381
          Plaintiff,                )
                                    )      Magistrate Judge Arlander Keys
     v.                             )
                                    )
CAROLYN W. COLVIN,                  )
,                                   )
Commissioner of                     )
Social Security,                    )
                                    )
          Defendant.                )
```

<u>MEMORANDUM OPINION AND ORDER</u>

This case is before the Court on Thomas Dante's motion for summary judgment. He seeks judicial review of the final decision of the Commissioner of Social Security finding him not disabled and denying his claim for Social Security Benefits under Title II of the Social Security Act, 42 U.S.C. §§416 and 423.

Mr. Dante raises several issues for review, including: 1) whether the Administrative Law Judge ("ALJ") erred when she rejected Dr. Hallman's opinion that Mr. Dante needed to elevate his legs to prevent swelling, 2) whether the ALJ improperly determined that Mr. Dante experienced no side effects from his medication because of his failure to report the side effects to his physicians, 3) whether the ALJ failed to explain the support behind her conclusion that a one-minute break to stand was an appropriate accommodation,

4) whether the ALJ failed to resolve conflicts in the
evidence presented by the vocational expert, 5) whether the
ALJ erred when she failed to order a consultative
psychiatric examination upon her determination that Mr.
Dante suffered from a severe mental impairment, and 6)
whether the ALJ improperly evaluated Mr. Dante's
credibility.  For the reasons set forth below, Plaintiff's
motion for summary judgment is granted, and the
Commissioner's motion for summary judgment is denied.

## BACKGROUND FACTS

### PRE-DECISION PROCEDURAL HISTORY

On January 26, 2009, Plaintiff, Thomas Dante, applied
for Disability Insurance Benefits (DIB), and Supplemental
Security Income (SSI), alleging that he became disabled on
June 4, 2007 because of ankle injuries, arthritic knees, and
dyslexia.  In February 2009, his application for SSI was
denied because he and his wife owned $180,000 in resources
by the date of his January 2009 application, exceeding the
$3,000 SSI resource limit.  His application for DIB was soon
after denied on April 30, 2009, because it was determined
that, based on the medical evidence, although he could not
perform his previous job, he had the ability to perform
sedentary work.  On May 18, 2009, Mr. Dante filed a request

for reconsideration, which was also denied based on medical evidence that he could still perform sedentary work.

On August 6, 2009, Mr. Dante filed a request for a hearing before an Administrative Law Judge (ALJ), which was conducted on December 13, 2010.  ALJ Roxanne Kelsey issued a ruling denying benefits on December 23, 2010, finding that Mr. Dante was not disabled under sections 216 (i) and 223 (d) of the Social Security Act.

POST-DECISION PREOCEDURAL HISTORY

Mr. Dante requested review by the Appeals Council, but was denied on May 7, 2012.  Thus, the ALJ's decision became the final decision of the Commissioner.  Mr. Dante filed a complaint with this court on May 30, 2012, seeking a review of the decision.  The parties consented to exercise of jurisdiction by a magistrate judge on August 14, 2012. Thereafter, cross-motions for summary judgment were filed. This Court has jurisdiction pursuant to 42 U.S.C. §405(g).

HEARING TESTIMONY

I. Claimant's Hearing Testimony

At the December 13, 2010 hearing before the ALJ, Mr. Dante, who was born on April 4, 1968, appeared and was represented by counsel.  Mr. Dante testified that he has a high school diploma.  [R. at 34.]  During high school, he took regular classes as well as supplemental classes to

3

assist students with learning disabilities. [R. at 35.] He testified that he did not pursue any formal education or vocational courses after graduating from high school. [R. at 36.]

Mr. Dante testified that he had not worked since June of 2007. [R. at 36.] He also testified that he was injured while at work at Kraft, but that he was able to continue working for a while after the injury occurred. *Id.* Mr. Dante testified to seeking medical attention for his injury. [R. at 37.] He also testified to having surgery for the injury, which he stated was very painful and long-lasting. *Id.* Mr. Dante testified that the surgery was to address problems with his ankle, but that he is also experiencing problems with his right knee. *Id.* He testified to needing a full-knee replacement at some point in the future. [R. at 38.]

After the ALJ noted Mr. Dante's use of a cane, Mr. Dante testified that sometimes he requires a cane to walk around. [R. at 38.] He testified that during inclement weather he uses a cane to prevent from falling, but that during warmer weather he usually does not need one. *Id.* Mr. Dante also testified that he was 6'1'' tall, and weighed 255 pounds. [R. at 40.]

Mr. Dante testified that he could sit for fifteen minutes at a time before needing a standing break, as his ankle and knee start to stiffen. [R. at 40.] He also testified that his Attention Deficit Hyperactivity Disorder (ADHD) caused him to become jumpy after sitting for fifteen minutes. *Id.*

Mr. Dante testified that, although he took Ritalin as a child for his ADHD, he was not currently on Ritalin, and instead wanted to control it without medication because he feared its side effects, namely having mood swings. [R. at 41.] Mr. Dante testified that his ADHD did not interfere with his job at Kraft, and, in fact, his job was helpful for dealing with his ADHD. *Id.* He testified that his job with Kraft entailed performing different tasks throughout the workday and that he interacted with others, which made him feel more flexible. *Id.* He testified to seeing a doctor about his ADHD. [R. at 43.] The ALJ questioned him about whether or not the doctor that evaluated him for his ADHD was a pediatrician or not. *Id.* Mr. Dante testified that the doctor treated infants, adolescents, and adults. *Id.* After the ALJ asked why he chose this particular doctor, he testified that an associate, who had a good experience with the doctor, referred him. *Id.*

5

With regard to his living situation, Mr. Dante testified that he lives with his wife and his daughter, who turned fifteen the day of the hearing. [R. at 44.] He testified that he drives, but that it can be problematic at times due to the loading brace he wears on his right knee, which irritates him while driving. As a result, he only drives short distances. *Id.* Mr. Dante testified that, after about twenty to twenty-five minutes of driving, his knee will begin to hurt. [R. at 45.] He testified that the time it takes for his knee to become irritated depends on the driving conditions, such as stop and go traffic. *Id.*

Mr. Dante testified that his medication causes him to feel drowsy, forcing him to take daily naps. [R. at 45.] He also testified that Dr. Hallman increased his dosage during the winter months because that is when his pain is worse. *Id.* Mr. Dante testified that he experienced an increase in drowsiness along with the increase in his dosage. *Id.*

Mr. Dante testified that his typical day begins with him waking up and having breakfast with his wife; after breakfast, he performs exercises for his knee and ankle in order to loosen them up. [R. at 46.] He testified that he and his wife take turns taking their daughter to school; on his designated days he drops her off, grabs coffee, and then

6

goes to Chicago Ridge Mall to perform his exercise program. *Id.* He testified that Dr. Hallman created his exercise program, and it consists of walking increments which help him to maintain mobility and keep his cholesterol level down. *Id.* He testified that, after performing his exercise program at the mall, he usually visits the local library. [R. at 47.] While at the library, he testified that he visits with some of the employees and reads. *Id.* Mr. Dante testified that, upon leaving the library, he returns home, takes his pain medication, and takes a nap. *Id.* On the days he transports his daughter, he testified that, after he picks her up from school, he returns home. *Id.*

Mr. Dante testified that he takes pain medication four times a day; taking a nap afterwards each time. [R. at 47.] He also testified that during his naps he must elevate his knee, in order to make sure he does not suffer from edema swelling at his ankle. *Id.* He testified that he elevates his knee three to four times a day for thirty to forty minutes, using a special pillow that he purchased. [R. at 48.]

Mr. Dante testified that the only chore he performs is occasional light dusting around the house. [R. at 48.] He testified that he collects antique toys as a hobby. *Id.* He testified that he enjoys reading books on antique toys, his

7

daughter searches eBay for toys for him to purchase, and his friends bring him items from toy shows. [R. at 48-49.]

Mr. Dante testified that he was in pain during the hearing, which he rated as seven and a half to eight out of ten. [R. at 49.] He testified that the pain felt like a shooting pain in his ankle and a sharp pain in his knee. [R. at 49-50.] He testified that he experienced pain every day, but that his medication did offer some assistance. [R. at 50.] Mr. Dante testified to being able to carry and lift an item weighing from ten to twenty pounds. *Id.* He testified that he can sit for fifteen minutes before needing to stretch, which he stated takes five minutes. *Id.* He can walk distances measuring no more than one block. *Id.* He also testified to being able to stand for only fifteen minutes. [R. at 51.]

Mr. Dante testified that he struggles with his memory, often times forgetting things because his mind is racing. [R. at 51.] He testified to struggling with memory issues his entire life, which he believes he inherited from his mother. *Id.* In addition to ADHD, he testified to having organization compulsions. [R. at 53.]

During Mr. Dante's examination by his counsel, he testified that he has trouble sleeping through the night; waking up twice a night because of the pounding pain in his

ankle and knee. [R. at 55.] The ALJ asked counsel if the doctor's recommendation that Mr. Dante elevate his knee and ankle appeared in the medical record. *Id*. Mr. Dante's counsel responded that he did not recall where it appeared in the record. [R. at 56.]

Mr. Dante also provided testimony on a finger injury he sustained when he tripped down the stairs after his knee began causing him problems. [R. at 56.] He also testified to having difficulties using stairs and lacking the ability to bend or stoop down. [R. at 58.] Mr. Dante testified to taking Mobic, 15mg an anti-inflammatory, and Tramadol, 15mg, four times a day. *Id*.

II. Vocational Expert's Hearing Testimony

The ALJ also heard testimony from Lee Knutsen, a Vocational Expert ("VE") who reviewed Mr. Dante's work-record and heard Mr. Dante's testimony before the ALJ. The VE testified that Mr. Dante's previous job was heavy and semi-skilled with a SVP of 3. [R. at 59.] The ALJ then proceeded to pose different hypotheticals to the VE based on an individual with the same age, education, and vocational experience as Mr. Dante. [R. at 60.] The ALJ asked the VE whether such an individual could work jobs requiring light exertion with the following non-exertion limitations: they cannot climb ladders, rope, or scaffolds; and can

9

occasionally climb ramps, stairs, stoop, kneel, crouch, or crawl, would still be able to perform Mr. Dante's previous job. *Id.* The VE testified that such an individual would not be able to perform Mr. Dante's previous job. *Id.* However, the VE testified that this individual could work as a light, unskilled assembler, adding that there are over 19,000 positions of this type of work in the Chicago area. [R. at 61.] The VE testified that this particular individual could also work as a machine tender and that there are 15,700 machine tender jobs in the Chicago area. *Id.*

The ALJ continued with the first hypothetical, adding the necessity that the individual would need to be able to stand and stretch approximately every 15 minutes, for a period of one minute or less. [R. at 61.] The VE testified that an individual with these limitations would be able to perform some sedentary jobs, including that of a sedentary cashier. [R. at 62.] The ALJ then asked if an individual, who can sit for eight hours, stand for five hours, and walk for four hours, walking occasionally for moderate distances, with the following limitations: the individual can occasionally bend, stoop, crawl, or climb stairs, maintain minimal balance, and the individual cannot squat, crouch, or kneel, nor operate foot controls with his left foot, would

10

be able to perform Mr. Dante's previous job. [R. at 62-63.]
The VE testified that this individual would not be able to
perform Mr. Dante's previous job, but that he would be able
to perform the light level jobs, which he mentioned
previously. [R. at 63.]

The last hypothetical posed by the ALJ considered
whether an individual with the previously mentioned
limitations, requiring sedentary work, along with the
following requirements: the ability to perform a variety of
tasks and minimal writing, would be able to perform any job.
[R. at 63.] The VE testified that this individual could
perform a sedentary job as an order clerk, a sedentary
cashier, or a surveillance system monitor, although these
jobs contain a lot of repetition. [R. at 64.] The VE then
testified that there is some variety within the cashier job,
such as interacting with various people and handling
different forms of payment. [R. at 65.]

The VE testified that he did not think there were any
jobs that would allow a person to be off task for thirty
minutes at a time, twice a day. [R. at 66.] If a person
completely lacked the ability to stoop at all, the VE
compared this inflexibility to being in a body cast, and
testified that this individual would also not be employable
in any job. *Id.*

III. MEDICAL RECORDS

In addition to the testimony of Mr. Dante and the VE, the ALJ also considered Mr. Dante's relevant medical records from his treating doctors.

Knee and Ankle Issues

Dr. Hallman, an orthopedic surgeon, first evaluated Mr. Dante on March 6, 2003 for problems associated with his right knee. [R. at 339.] Dr. Hallman diagnosed him with a torn medial meniscus, and changes consistent with chondromalacia of the right knee. *Id.* Mr. Dante had arthroscopic surgery and an excision of a synovial cyst at his right knee on April 28, 2003. *Id.* After the surgery, he began receiving medical and injection therapy for arthritis in his right knee. *Id.* Mr. Dante later returned to work without complications from his knee disorders. *Id.*

On April 26, 2004, Plaintiff visited Dr. Hallman for pain in his feet. [R. at 339.] He was diagnosed with calcaneal spurs in both of his feet, with the condition being more severe in his left foot. *Id.* He was provided with heel pads and an injection for the fasciitis and spur on his left foot. *Id.* Mr. Dante was also taking Bextra for inflammatory joint disorders. *Id.* His follow-up examination on May 4th, 2004 revealed complete improvement

of his right foot and about 80% improvement of his left.
*Id.*

On November 12, 2004, Mr. Dante visited Dr. Hallman for increasing pain in his right foot and ankle area. [R. at 340.] He was prescribed an anti-inflammatory medication and the doctor provided him with activity recommendations. *Id.*

Mr. Dante allegedly tripped over a pallet at work on January 26, 2005, causing him to strike the pallet and the concrete floor with his right knee. [R. at 340.] On January 27, 2005, he visited Dr. Hallman, who identified changes suggesting a contusion and a probable hairline fracture of the right knee. *Id.* Dr. Hallman prescribed analgesics to control the pain. *Id.* Mr. Dante suffered articular cartilage loss along the mediofemoral condyle of the right knee. *Id.* On February 16, 2005, his cast therapy was discontinued and physical therapy was prescribed. *Id.*

On March 3, 2005, during his visit with Dr. Hallman, Mr. Dante reported that he could no longer perform his regular work activities. [R. at 340.] The exam revealed changes consistent with resolution of a contusion type injury to his right knee. *Id.* Dr. Hallman prescribed work-hardening and physical therapy. *Id.* Mr. Dante's right knee disorder healed satisfactorily, and he returned to work on April 4, 2005. *Id.*

13

On May 6, 2005, Mr. Dante returned to Dr. Hallman,
complaining of pain, redness and swelling of his left ankle.
[R. at 340.]  He had been on a weight management program and
he was working out regularly.  *Id.*  The active ranges of
both ankles were determined regular, but he was diagnosed as
having a possible gout-type disorder and prescribed Indocin.
*Id.*  When he returned on May 20, 2005, he reported that his
symptoms had improved and he was prescribed orthotic
supports only.  *Id.*

On June 3, 2005, Mr. Dante visited Dr. Hallman,
complaining that he was experiencing persistent pain in his
left ankle, and that the pain grew worse with walking and
standing activities.  [R. at 341.]  He also reported that he
had stumbled over some pallets while working two weeks prior
to the appointment, and he believed that he had turned or
twisted his ankle.  *Id.*  The exam revealed that he had a
small calcaneal spur.  *Id.*  Due to the increased symptoms,
Dr. Hallman felt that additional support for his ankle was
appropriate.  *Id.*  Mr. Dante was fitted with an elastic
support and an ankle stirrup brace was applied.  *Id.*

Two weeks after the June 3rd appointment, Mr. Dante
complained of pounding pain in his left ankle and foot area,
despite the fact that he had been on vacation.  [R. at 341.]
He was given injection therapy at a trigger point in his

14

left ankle near the posterior tibialis region. *Id*. He had
a follow-up appointment on July 1, 2005, which revealed that
the injection did help him substantially, and the orthotic
was working, as well. *Id*.

On September 29, 2005, Mr. Dante reported to Dr.
Hallman that he had twisted his left ankle again two weeks
before his appointment, and that his left foot and ankle
pained him. [R. at 341.] Dr. Hallman felt that he had
post-traumatic synovitis at his left ankle as a result of a
sprain injury, and he advised Mr. Dante to moderate his
activities. *Id*. Mr. Dante was also prescribed a non-
steroid anti-inflammatory drug, Mobic. *Id*. Mobic did not
provide him with much symptom relief, so during his follow-
up appointment he was prescribed a Medrol Dose Pak. *Id*.
The Medrol provided him with symptom relief, but the
symptoms returned after the medication was completed. *Id*.

On November 18, 2005, Mr. Dante's exam revealed
swelling at the posteromedial aspect of his left ankle,
though the mobility of his left ankle remained favorable.
[R. at 342.] He returned to Dr. Hallman on December 12,
2005, and despite rest, orthotic supports, ankle braces,
analgesics, non-steroidal medications, as well as a steroid
anti-inflammatory medication, the symptoms in his left ankle
only improved briefly before they reoccurred. *Id*. An MR

scan revealed a tear involving the mid-portion of the posterior tibial tendon, as well as a tear of the tibial talar ligament. *Id*. Mr. Dante decided to move forward with a surgical treatment for his left ankle condition. *Id*.

On January 20, 2006, Mr. Dante underwent reconstruction of the posterior tibialis tendon, using a flexor tendon transfer, at his left ankle region. [R. at 342.] He was placed in a non-weight bearing short leg cast for approximately six weeks, which facilitated favorable wound healing. *Id*. He then began walking cast therapy, which was continued for two weeks. *Id*. Soon after, the cast was discontinued and he was prescribed physical therapy. *Id*. At this time, Mr. Dante was using a cane or a walker for support, and he was supposed to use orthotic supports with his shoes. *Id*.

As Mr. Dante's physical therapy progressed, he required narcotic analgesics for pain control. [R. at 342.] He was advised to take non-steroidal, anti-inflammatory drugs to control the pain in his left foot and ankle during the recovery process. *Id*. Additionally, Dr. Hallman provided Mr. Dante with an acid inhibitor to minimize any potential stomach disturbances while he was taking the medications. *Id*.

Five months post-surgical treatment, on June 16, 2006, Mr. Dante continued with outpatient and home physical therapy exercises. [R. at 342.] He continued using a cane when walking around outside of his home. *Id*. He also used support hose and orthotics regularly. *Id*. During his visit he complained of spasms in his left leg while being active. *Id*. The exam revealed a substantial antalgic gait. *Id*.

Mr. Dante did not believe that he was ready to transition to sedentary work duties at his job, and he continued with physical therapy. [R. at 342.] From August 16, 2006 through October 30, 2006, Mr. Dante completed a work-hardening program. [R. at 343.] He then began gradual progression with work activities. *Id*. Upon his completion of the work-hardening program, his therapist believed that he had significantly improved, though he was still functionally impaired and experienced pain. *Id*. In the therapist's discharge summary it was reported that Mr. Dante's gait remained altered somewhat and that there were limitations in his active range of motion in his left ankle. *Id*. He also reported that Mr. Dante's pain was still a factor, with him reporting his pain as 4-6 out of 10. *Id*. The discharge summary stated that Mr. Dante had the basic abilities to return to work, and with determination he should be able to refine his skills on the job. *Id*.

17

During a visit with Dr. Hallman on December 15, 2006, Mr. Dante requested a note releasing him to full work duties. [R. at 343.] He continued to use an ankle support for his left lower extremity, and he still needed a prescription for the pain medication, Ultram. *Id*. The range of motion in his left ankle was also diminished. *Id*. During the visit, Mr. Dante received a release for full work duties, with an 8-hour restriction. *Id*.

After returning to full work duties, Mr. Dante continued to require analgesic and anti-inflammatory medications. [R. at 343.] He also required the replacement of a fractured and failed orthotic device. *Id*. He had been progressing in a weight loss program, and by March of 2007 he had lost 40 pounds. *Id*. It was around that time that he began to report that, by the end of his workday, he experienced significant pain in his left foot. *Id*. In spite of his diligent rehab efforts, it was determined that he could not tolerate the normal demands of his job. *Id*. Dr. Hallman recommended a functional capacity evaluation. *Id*.

On April 17, 2007, Mr. Dante had a functional capacity evaluation. [R. at 343.] According to the job analysis profile, his current job fell into the medium-heavy to heavy

18

physical demand level, though his abilities were found to fall below that level of functional capacity. *Id*.

Dr. Hallman saw Mr. Dante on June 4, 2007. [R. at 344.] During the appointment, the doctor advised him not to return to his job at Kraft. *Id*. Dr. Hallman believed his impairments and limitations were permanent, and suggested vocational retraining consistent with his functional capacity evaluation. *Id*.

During the December 1, 2010 visit, Dr. Hallman noted that Mr. Dante continued to have weakness in his left ankle, and that he had advanced osteoarthritis in his right knee. [R. at 433.] On December 13, 2010, Dr. Hallman also noted that he believed it was medically necessary for Mr. Dante to elevate his left ankle and right knee at least three times periodically throughout the day, in order to prevent swelling. [R. at 434.]

On April 15, 2009, Mr. Dante had a consultative visit with Dr. Patil, for the purpose of providing information to the Bureau of Disability Determination Service. [R. at 381.] The X-rays taken of Mr. Dante's left ankle during his appointment revealed no evidence of fracture or dislocation. [R. at 384.] Mr. Dante's ankle motion was normal, however, the X-ray revealed a small plantar calcaneal spur. *Id*. Dr. Patil noted that Mr. Dante's

speech was moderately pressured and loud, and that he demonstrated flight of ideas. [R. at 382.] He also observed that Mr. Dante seemed mildly anxious and that he provided circumferential answers to his questions. *Id*.

ADHD Disorder

On July 6, 2010, Mr. Dante saw Dr. Delach. [R. at 254.] Dr. Delach diagnosed him with attention hyperactivity deficit disorder (ADHD), as well as chronic lateness, forgetfulness, and difficulty in following directions. *Id*.

IV. THE ALJ'S DECISION

The ALJ issued her decision on December 23, 2010, finding that Mr. Dante had not been under a disability within the meaning of the Social Security Act from June 4, 2007, through the date of her decision [R. at 24.] The ALJ applied the five-step sequential analysis as required by the Act, under 20 C.F.R. 404.1520(a).

At step one, the ALJ determined that Mr. Dante had not engaged in substantial gainful activity since June 4, 2007, the alleged onset date. [R. at 16.]

At step two, the ALJ determined that Mr. Dante had the following severe impairments: residual weakness of his right ankle following an injury, arthritis in his knee, obesity, and attention deficit hyperactivity disorder. [R. at 16.]

20

At step three, the ALJ found that Mr. Dante did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments from 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). [R. at 16.] The ALJ explained that Mr. Dante's severe impairments, considered individually or amalgamated, do not meet the requirements of any listing, because there is no evidence of an inability to ambulate effectively as defined by the listing, as a result of these impairments. [R. at 16-17.] The ALJ further explained that Mr. Dante's mental impairment does not satisfy either the "paragraph B" criteria nor the "paragraph C" criteria, meaning it does not meet or medically equal the criteria of listing 12.02. [R. at 17.]

At step four, the ALJ concluded that Mr. Dante's residual functional capacity would allow him to successfully adjust to performing sedentary work as defined in 20 C.F.R. 404.1567(a). [R. at 18.] The ALJ found that Mr. Dante required a position in which he would not have to climb ladders, ropes, or scaffolds; would only have to occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; allow him to stand and stretch approximately every 15 minutes for a period of 1 minute or less; provide him with a

21

variety of tasks; and require him to perform no more than occasional writing. [R. at 18.]

In making her decision, the ALJ noted that she considered all of Mr. Dante's symptoms and the extent to which these symptoms could reasonably be accepted as consistent with objective medical evidence and other evidence, as is required under 20 C.F.R. 404.1529 and SSR's 96-4p and 96-7p. [R. at 18.] Additionally, the ALJ considered opinion evidence in accordance with the requirements of 20 C.F.R. 404. 1527 and SSR's 96-2p, 96-5p, 96-6p and 06-3p. *Id*. The ALJ then summarized Mr. Dante's testimony and stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
> [R. at 19.]

Next, the ALJ summarized all of Mr. Dante's medical records. [R. at 19-20.] The ALJ concluded his review with the following statement:

> In sum, the above residual functional capacity assessment is supported by the claimant's treatment records, which indicate that the claimant experiences some weakness and limitation of motion due to his physical impairments; the claimant's reported activities; and the opinion of the state agency's medical consultants. [R. at 23.]

22

The ALJ concluded by finding that Mr. Dante had the residual functional capacity to perform less than a full range of sedentary work. *Id*.

At step five, after considering the testimony of the VE and the results of his residual functional capacity evaluation, the ALJ found that Mr. Dante was unable to perform past relevant work, under 20 C.F.R. 404.1565. [R. at 23.] The ALJ then determined that the transferability of job skills was not material to the determination of disability, because the use of the Medical-Vocational Rules (SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2) supported the conclusion that the claimant is "not disabled," despite his transferable job skills. *Id*.

Lastly, after reviewing the testimony of the VE, the ALJ found that, based on Mr. Dante's age, education, work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy. [R. at 24.] Therefore, the ALJ determined a finding of "not disabled" appropriate under the framework of the above-cited rules, and that Mr. Dante was not entitled to benefits. [R. at 24.]

### **STANDARD OF DISABILITY ADJUDICATION**

23

In order to be entitled to benefits under the Social Security Act, a claimant must be evaluated under a five-step inquiry and found to be "disabled." 20 C.F.R. § 404.1520. Step one requires the ALJ to determine whether the claimant is employed. Under step two, the ALJ must determine whether the claimant has a severe impairment as defined by the Social Security Administration. At step three, the ALJ determines whether the impairment meets or is medically equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. During step four, the ALJ evaluates the claimant's "Residual Functional Capacity" ("RFC") and determines whether he can perform his past relevant work. Finally, during step five, the ALJ determines whether the claimant has the ability to perform any other work that exists in the national economy.

## STANDARD OF REVIEW

When addressing an appeal of an ALJ's decision, a district court must affirm the decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). When determining whether the evidence is substantial, it must be "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "such relevant evidence as a reasonable mind might accept as

24

adequate to support a conclusion." *Id.* When reviewing the ALJ's decision for substantial evidence, the court cannot "displace the ALJ's judgment by reconsidering facts or evidence or making [a] credibility determination." *Skinner v. Astrue,* 478 F.3d 835 (7th Cir. 2007). Should there be conflicting evidence that leads reasonable minds to differ in opinion, it is solely the ALJ's responsibility to determine whether the claimant is disabled, not the district court. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990). Even though an ALJ is not required to address every piece of evidence in the record, she must furnish her analysis through building a logical and accurate bridge between the evidence and her conclusions, thus allowing a reviewing court to conduct a meaningful review of the ultimate findings of the Social Security Administration. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). A court must affirm the ALJ's decision if there is substantial evidence supporting her decision, unless the ALJ does not articulate the grounds for her decision in such a way that allows a meaningful review. *Sims,* 309 F.3d at 429.

## ANALYSIS

Mr. Dante raises several objections to the ALJ's decision; the Court will discuss each in turn. The claimant

25

argues that: 1) the Administrative Law Judge erred when she rejected Dr. Hallman's medical opinion that Mr. Dante needed to elevate his legs to prevent ankle and knee swelling, 2) the ALJ improperly determined that Mr. Dante experienced no side effects from his medication because of his failure to report them to his physicians, 3) the ALJ failed to explain the support behind her conclusion that a one minute break to stand was an appropriate accommodation, 4) the ALJ failed to resolve conflicts in the evidence presented by the vocational expert, 5) the ALJ erred when she failed to order a consultative psychiatric examination upon determining that Mr. Dante suffered from a severe mental impairment, and 6) the ALJ improperly evaluated Mr. Dante's credibility.

**A.  WHETHER THE ALJ ERRED WHEN SHE REJECTED DR. HALLMAN'S MEDICAL OPINION ON MR. DANTE'S NEED TO ELEVATE HIS LEGS TO PREVENT SWELLING.**

Mr. Dante first argues that the ALJ erred by rejecting his treating physician, Dr. Bruce W. Hallman's, opinion on Mr. Dante's need to elevate his legs.  Pl.'s brief at 7. Mr. Dante cites several Seventh Circuit cases to support his argument that ALJs cannot ignore evidence that supports the existence of a limitation, and that any medical judgments made by the ALJ must be substantiated by evidence.  Pl.'s brief at 8.

The Commissioner argues that the ALJ reasonably rejected Dr. Hallman's opinion because the medical records made no mention of Mr. Dante's need to elevate his legs. Commissioner's Motion for Summary Judgment, p. 7. Defendant asserts that, since no mention of Dr. Hallman's opinion on elevation was made in his own treatment notes, inconsistencies exist without such evidentiary support. *Id.*

In order for the ALJ to reach a medical conclusion which contradicts that of Dr. Hallman's opinion, she must use medical evidence, rather than her own opinion, to support her conclusion. *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000). The medical evidence the ALJ used to support her conclusion is the absence of Dr. Hallman's recommendation anywhere else in Mr. Dante's medical records, as well as his most recent medical records, which state that he presented with no swelling. [R. at 21.]

Mr. Dante's medical records contain no recommendation for him to elevate his legs three times a day, other than the letter written by Dr. Hallman in December 2010. Pl.'s brief at 7. Although no other physicians recorded this recommendation in their notes, and even Dr. Hallman failed to include the recommendation in his treatment notes, the absence of the statement in the medical records is only substantial proof of the fact that the recommendation was

27

never recorded. The only written document regarding Mr. Dante's need to elevate his legs is the letter written by Dr. Hallman, and without medical evidence that contradicts this finding, the ALJ cannot conclude that this opinion is incorrect.

Lastly, the ALJ used Mr. Dante's most recent medical records, which state that he had no swelling, as further evidence that the elevation recommendation is unnecessary. The fact that Mr. Dante presented with no swelling during this appointment could be attributed to many different factors. The ALJ fails to articulate how this incident is proof of him not needing to elevate his legs, as Dr. Hallman had advised. Because Mr. Dante did not experience swelling during the appointment does not mean that he does not experience any swelling at all, or further, that elevating his legs does not mitigate the swelling.

The ALJ failed to provide a bridge from the medical evidence to her conclusion. Therefore, the Court cannot conduct a meaningful review of the ALJ's finding that the Plaintiff does not need to elevate his legs.

**B. WHETHER THE ALJ IMPROPERLY DETERMINED THAT MR.DANTE EXPERIENCED NO SIDE EFFECTS FROM HIS MEDICATION BECAUSE OF HIS FAILURE TO REPORT THEM TO HIS PHYSICIANS.**

Although there was no evidence that Mr. Dante reported any side effects to his physicians, he contends that the ALJ

improperly determined that he did not experience drowsiness as a side effect of his medications. Pl.'s brief at 9. The Commissioner argues that the ALJ rejected Mr. Dante's allegation that his pain medication causes drowsiness because his medical records indicated that he had not reported this to his physicians, and, conversely, he actually tolerated his medications quite well. Commissioner's Motion for Summary Judgment, p. 4.

An ALJ cannot conclude that a claimant's medication produces no side effects based on a claimant's failure to report the side effects to their physician. *Terry v. Astrue*, 580 F. 3d 471, 477 (7th Cir. 2009). Mr. Dante failed to inform his physicians that his medication was causing drowsiness. As a result of his failure to report the side effect, there is no medical record to substantiate his allegation. Although there is no medical record that Mr. Dante reported any side effects, the medical records do not prove that he never experienced any side effects, only that he failed to report them. The ALJ's conclusion that Mr. Dante did not experience drowsiness must be based on medical evidence that proves he did not, or testimony from the claimant that contradicts his assertion that he did experience drowsiness. The Court finds that the record contains neither.

29

The ALJ also used the statement from Mr. Dante's medical records that he tolerated his medications well, to support her conclusion.  Commissioner's Motion for Summary Judgment, p.  4.  It is reasonable to assume that Mr. Dante's physicians were aware that he no longer worked and spent most of his time at home.  Because Mr. Dante spent most of his time at home, it is likely that his physicians did not perceive drowsiness to be a hindrance to his daily activities.  Based on his situation, it is possible that his physicians did determine that he tolerated his medication well, even while he experienced drowsiness.

There is not enough evidence supporting the ALJ's determination that Mr. Dante experienced no side effects, therefore, the Court is unable to provide meaningful review of this issue.

> **C.  WHETHER THE ALJ FAILED TO EXPLAIN THE SUPPORT BEHIND HER CONCLUSION THAT A ONE-MINUTE BREAK TO STAND WAS AN APPROPRIATE ACCOMODATION.**

Mr. Dante claims that the ALJ failed to provide an explanation for her conclusion that he needed only a one-minute or less break to stand.  Pl.'s brief at 10.  Mr. Dante relies on a Seventh Circuit case, which asserts that when an ALJ assesses a claimant's residual functional capacity (RFC), she must explain how the evidence supports

her conclusions.  *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005).  *Id*.

The Commissioner argues that the ALJ found that there was minimal objective evidence for his limitation on sitting, but she accommodated Mr. Dante's request by including the recommendation that he needs one minute to stand after sitting for 15 minutes.  Commissioner's Motion for Summary Judgment, p.  5.  The Court agrees.

The ALJ considered Mr. Dante's request for a one-minute break to stand during the hearing as an example of the kind of break he would need after sitting for extended periods of time during his daily life.  The ALJ determined that Mr. Dante's medical record contained enough information to warrant a one minute standing break and that such a request was credible.  Therefore, the ALJ's conclusion that a one-minute break to stand was an adequate accommodation was based on Mr. Dante's credibility, the ALJ's perception of him during the hearing, and by the support found in the medical records.

The Court finds that the ALJ did not err in including the recommendation that he needs one minute to stand after sitting for 15 minutes, and that there is enough evidence supporting the ALJ's conclusion to substantiate such an accommodation.

**D.   WHETHER THE ALJ FAILED TO RESOLVE CONFLICTS IN THE EVIDENCE PRESENTED BY THE VOCATIONAL EXPERT.**

Mr. Dante argues that the ALJ failed to resolve conflicts in the VE's testimony.  Pl.'s brief at 11.  On the contrary, the Commissioner argues that the ALJ resolved any possible conflicts in the VE's testimony by conducting further examination and obtaining further explanation. Commissioner's Motion for Summary Judgment, p.  5.

During Mr. Dante's hearing, the following exchange occurred between the VE and the judge, while the VE testified:

> **ALJ**: I'm going to go with the hypothetical number two, that was the sedentary hypothetical with the – and all of the non-exertionals of the first – second hypothetical with the following addition: The individual would need to have a job that enables [them] to perform a variety of tasks or requires a variety of tasks, let's say. And also would require minimal writing by him. No problems with the reading, but minimal writing, say no more than occasional to clarify that a little bit better.  Do you need any clarification on that hypothetical?
> **VE:** No, I don't –
> **ALJ:** Okay.  So such an individual would still be unable to perform past work, would there be any other work?
> **VE:**  Let's see.  I think per the sedentary job, I think he could still perform as order clerk, the sedentary cashier, and the surveillance system monitor . . . I need to note that these are all unskilled jobs. Simple, unskilled jobs so they're not known for variety.
> **ALJ:** Okay.
> **VE:** There's a lot of repetition involved.  I think for more variety of tasks, you probably would have to go for some sort of skilled or semi-skilled.
> **ALJ:** But the cashiers and the food and beverage are still working with different people –

32

> **VE:** There is.
> **ALJ:** Different problem that are going on with different
> – making different kinds of change, using different
> credit cards, there's some –
> **VE:** There's still variety, it's --
> **ALJ:** Right.
> **VE:** It's a routine, but probably the cashier and the
> order clerk – I think I'll throw out the surveillance
> system monitor.  I think –
> **ALJ:** Okay.
> **VE:** Maybe – well, maybe a sedentary packer.
> **ALJ:** Okay.
> **VE:** Might – well, I guess all of them.  You can leave
> the surveillance system monitor in, they're all going
> to have a routine to 'em, but there are still different
> things to do in the job.  [R.  at 65]

The VE originally testified that all of the sedentary
jobs that were a fit for an individual with Mr. Dante's RFC,
were unskilled, therefore they were not known for variety.
The ALJ then proceeded to ask the VE a series of questions,
which allowed him to further explain the variety of duties
one would engage in as it pertains to each job.

The ALJ's line of questioning clarified and resolved
any possible inconsistencies or initial conflicts the VE's
testimony provided.  Therefore, the Court finds that no
conflict was left unresolved by the vocational expert's
testimony.

### E.  WHETHER THE ALJ ERRED WHEN SHE FAILED TO ORDER A CONSULTATIVE PSYCHTRIATIC EXAMINATION AFTER DETERMINING THAT MR. DANTE SUFFERED FROM A SEVERE MENTAL IMPAIRMENT.

Mr. Dante argues that the ALJ erred when she assessed
his mental impairment without a medical opinion.  Pl.'s

brief at 14.  Mr. Dante asserts that, although the State
agency physiatrist, who acted on behalf of the
administration, concluded that his ADD and Dyslexia were not
severe, the ALJ erred by not ordering further mental
examination.  Pl.'s brief at 14.

The Commissioner contends that the ALJ relied on the
assessment provided by the state agency reviewer, Dr. Glen
Pittman, Mr. Dante's work history, and his testimony to
determine that a limitation should be included in his RFC,
for his mental impairments.  Commissioner's Motion for
Summary Judgment, p. 8.

An ALJ must build a logical bridge from the evidence to
her conclusion.  *Young v. Barnhart,* 362 F.3d 995, 1002 (7th
Cir. 2004).  When Dr. Pitman concluded that Mr. Dante's
history of attention-deficit disorder and alleged dyslexia
were non-severe impairments, there was nothing further in
the medical records to suggest that the existence of these
impairments was anything more.  [R. at 22.]  After Mr.
Dante's consultation with Dr. Pitman, he was diagnosed with
ADHD.  *Id.*

Upon considering Dr. Pitman's conclusion, Mr. Dante's
ADHD diagnosis, his work history, and his testimony, the ALJ
reached the conclusion that his ADHD was indeed a severe

impairment.  The ALJ used substantial evidence to reach her conclusion on the severity of Mr. Dante's ADHD.

The Court agrees that the ALJ's analysis leads to a reasonable conclusion on the diagnoses and inclusion of ADHD in Mr. Dante's RFC.  The Court also agrees that this inclusion does not necessitate further mental examination.


**F.  WHETHER THE ALJ IMPROPERLY EVALUATED MR. DANTE'S CREDIBILITY.**

Lastly, Mr. Dante claims that the ALJ's use of boilerplate language to assess his credibility, without further explanation, is inconsistent with Seventh Circuit decisions.  Pl.'s brief at 17.  The Commissioner argues that the Seventh Circuit never held that the mere use of boilerplate language was grounds for reversal; rather it is the use of boilerplate language without any further explanation.  Commissioner's Motion for Summary Judgment, p. 8.

In reference to Mr. Dante's credibility, the ALJ states in her decision that she finds his "… medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are

inconsistent with the above residual functional capacity
assessment." [R. at 19.]

Although the ALJ may have used boilerplate language,
the Court finds that she, nonetheless, provided explanation
and sufficiently articulated the reasoning leading to her
credibility findings. Therefore, the Court finds that the
ALJ did not err in her evaluation of the Plaintiff's
credibility. Because it is apparent that the ALJ discounted
Plaintiff's drowsiness, however, on remand the ALJ should
attempt to further develop Mr. Dante's testimony concerning
the side effects his mandatory medications create, and re-
assess whether those statements are consistent or not with
other evidence in the record. Additionally, the ALJ should
also reconsider whether Dr. Hallman's recommendation for
Plaintiff to elevate his legs materially affects his ability
to perform.

## Conclusion

For the reasons set forth above, the Court grants Mr.
Dante's motion for summary judgment [#14] and denies the
Commissioner's motion for summary judgment. The case is
remanded to the Commissioner for further proceedings
consistent with this Memorandum Opinion and Order.

Date: August 16, 2013

ENTERED:

_____
MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT